Filed 8/7/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re I.B., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>A.B. et al.,<br><br>    Defendants and Respondents;<br><br>I.B., a Minor, etc.,<br><br>    Appellant. | G058814<br><br>(Super. Ct. No. 17DP0184)<br><br>O P I N I O N |

        Appeal from an order of the Superior Court of Orange County, Jeremy D. Dolnick, Judge.  Affirmed.

        Donna P. Chirco, under appointment by the Court of Appeal, for Minor and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Respondent A.B.

William Hook, under appointment by the Court of Appeal, for Defendant and Respondent A.M.

\*     \*     \*

The trial court granted A.B.'s (Mother)[1] Welfare and Institutions Code section 388 petition (all further statutory references are to the Welfare and Institutions Code), to return her three-year-old son (I.B.) to her care. The court ordered that I.B.'s older brother A.B. (five-years-old) would remain with foster parents who had been interested in adopting both boys. I.B.'s counsel filed this appeal asserting the siblings should not have been separated. In addition, I.B.'s counsel and the Orange County Social Services Agency (SSA), agree the juvenile court erred because Mother did not demonstrate a change in circumstances or that changing I.B.'s custody was in his best interests. Mother and A.M. (Father) filed briefs asserting the court's ruling should not be disturbed. Mother also filed a request asking this court to take judicial notice of a recent order showing the attorney representing both I.B. and A.B. declared a conflict of interest and now only represents A.B.

After carefully reviewing the record, while it is a close case, we cannot say the trial court abused its discretion. We affirm the order granting Mother's section 388 petition. We grant her request for judicial notice of the juvenile court's order dated April 3, 2020.

---

[1] Mother and her oldest son share the same initials. To avoid confusion, we will refer to the parent as "Mother" and to her child as "A.B."

2

FACTS

I. *The Previous Case*

In May 2014, the parents began participating in voluntary services. Mother, who is legally blind, was a non-minor dependent through extended foster care. She lived in an apartment with Father and newborn A.B. She and Father received WrapAround's services[2] for a year including domestic violence classes, anger management classes, parenting classing, and couples' therapy. The case closed in January 2015.

II. *The Current Case*

In February 2017, Father called the police to report Mother attacked him while he was holding then seven-month-old I.B. He alleged Mother was angry and threw a baby monitor at his head, causing a laceration that bled. A.B., who was then two-years old, witnessed the domestic violence. The police arrested Mother, issued an emergency restraining order for Father and the children, and notified SSA. Father declined to press charges or extend the restraining order. Mother moved back into the apartment with Father and the children.

Soon thereafter, the social worker requested a protective custody warrant to remove the children from their parents' custody after speaking with Mother's social worker, Monica Wilson, who was part of the Non-Minor Dependents Extended Foster Care Program. Wilson reported Father was not supposed to be living in the apartment with Mother. Wilson stated the parents had ongoing issues with domestic violence, but Mother's disability made Mother feel she needed Father's help to care for the children. When the couple was receiving WrapAround's services, staff noted Father would push

---

[2] "[T]he Wraparound service program . . . provide[s] 'family-based service alternatives to group home care using intensive, individualized services . . . .' The target population for the program is children in or at risk of placement in group homes...." (*In re W.B. Jr.* (2012) 55 Cal.4th 30, 41, fn. 2.)

3

Mother's "buttons" and she would lash out aggressively and physically towards Father. Wilson's other concern was Father was taking advantage of Mother's state disability checks, using the money for beer and marijuana instead of food.

Before seeking the warrant, the social worker also interviewed the parents. Father stated Mother often accused him of infidelity, and this was the trigger for many of their arguments. The social worker noted Father was appropriate, loving, and patient with the children. A.B. hugged Father throughout the entire interview. Mother reported Father was verbally abusive and constantly made her upset by saying he was going to find someone else to be with. She reported Father had previously thrown things. Mother admitted she hit Father in front of the children. Both parents wanted to resolve their issues and agreed to a safety plan.

Less than a week later, the social worker took the children into protective custody after receiving additional reports of domestic violence and that the home was unsanitary. Specifically, the social worker claimed the parents were not properly throwing away soiled diapers and dog feces. SSA prepared a petition alleging the children were at risk of harm (§ 300, subd. (b)) due to ongoing domestic violence and because their home was unsanitary. SSA also included in the petition allegations of a safety concern, relating to an incident that took place in November 2016. Due to Mother's visual impairment, she did not notice A.B. was covered in purple dye one evening because it was dark. When Father saw the child's condition, he argued with Mother and left the house. Mother called her youth partner and paramedics, who transported A.B. to the hospital due to concerns he swallowed iodine. Father "was the last person to use iodine" and although he typically stored it in a cabinet out of the child's reach, he "did not recall where it was last and he could not find the bottle until the day following the incident."

At the detention hearing, the court determined the children were at risk of harm and detained them in a group home. The following month, the social worker

4

reported I.B. was doing well but A.B. was struggling in the group home. A.B. did not like to share. He would also hit other children and took their toys. The staff at the Boys Town facility were working with him on his behavior issues. The social worker recommended the court order family reunification services including parenting classes, counseling, and anger management services. She referred Mother to a Personal Empowerment Program (PEP).

In April 2017, the court held a combined jurisdiction/disposition hearing. It determined the petition's allegations were true and removed the children from their parents' custody. The court ordered the parents to participate in SSA's recommended reunification services and ordered monitored visits.

In the social worker's next report, prepared in July 2017, she recommended continuing the six-month review hearing. A.B. continued to exhibit "behavioral challenges" and he was referred to counseling. In just two months, A.B. had 13 Special Incident Reports (SIRs) and the social worker was concerned about his development. The social worker was having difficulty placing the siblings together in a foster home and she asked Mother if the children could be separated for future placement. Mother was not supportive of this plan.

The social worker reported that although Mother was participating in court-ordered services, Father was not. The social worker believed Mother needed an additional parenting class because she was struggling with A.B.'s behavioral challenges. On two occasions, Mother pushed A.B. because he was being aggressive with I.B. while she was holding the infant.

Several months later, in October 2017, the social worker recommended the court continue reunification services. The children moved to a foster home, however, the foster mother requested removal in less than one month due to A.B.'s aggressive behavior. The children were moved into another group home, the Tustin Family Campus (TFC). A.B. was described as being aggressive towards other children, "specifically his

5

brother," and he did not respect boundaries. He whined to get attention, was impulsive, and exhibited aggression "towards animals (strangling)." A therapist diagnosed A.B. as having an "adjustment disorder with disturbance of conduct." One-year-old I.B. was healthy and developmentally on target.

The social worker noted the parents were making moderate progress with their reunification case plans. Mother completed the PEP, a parenting class, and attended counseling. Father was not participating in services but was employed and visited the children regularly. He and Mother were no longer living together. The social worker concluded the parents lacked insight because they asked for unsupervised joint visits even though they were unable to address their domestic violence issues or A.B.'s aggression. She noted Mother was unable to care for the children because she did not understand the following: (1) how her relationship with Father has impacted the children; (2) how her actions led to SSA's intervention; (3) how to control her anger; or (4) how to develop skills to address A.B.'s negative behavior.

The court ordered additional reunification services, as well as a psychological evaluation of Mother because her therapist expressed concern about her mental health. In an interim report, the social worker stated the parents were no longer visiting the children together. During a visit in November 2017, Mother hit Father and he requested future visits be without Mother. Mother said she was doing better and taking her medication. She claimed Father told A.B. to hit Mother like she had hit Father. The social worker noted Mother participated in domestic violence services but was struggling to manage her anger. As for Father, the social worker stated he was not visiting the children for as much time as was permitted by the court's order.

The social worker filed a report in February 2018, marking one year of these dependency proceedings. She noted the psychologist completed Mother's psychological evaluation and diagnosed Mother with having a mild intellectual

6

disability.[3]  The psychologist clarified this diagnosis would not interfere with Mother's ability to be a parent or benefit from services.  The psychologist recommended Mother participate in a weekly domestic violence program and visit the children separately from Father because they had a toxic relationship.  The social worker reported the parents agreed to separate visits, and she referred them to conjoint counseling sessions.

At the end of March 2018, the social worker prepared a report for the 12-month review hearing and recommended additional family reunification services.  The parents were participating in services but there were concerns about Mother's ability to respond to certain situations and separate permanently from Father.  Mother's therapist opined Mother lacked insight on how she could manage the children alone or respond if they had tantrums.  The social worker noted Mother completed two parenting programs and showed improvement with her parenting skills.  Both parents were consistently visiting the children 11 hours each week and acting appropriately.  Although the reports lacked specific details about Mother's positive interactions with the children, the social worker reported Mother usually arrived early and was observed playing games, modeling how to play, and singing and reading to the children.  She kissed them, changed their diapers, rocked I.B. to sleep, comforted A.B. when he fell, ate with them, played catch, taught them manners, showed A.B. how to wash a carrot and his hands, told the children she loved them, and danced with I.B.  Mother would ask the caregivers if the children had eaten and she brought them food and presents.  The reports contained detailed accounts of Mother's struggles in disciplining A.B., her difficulty keeping track of the

---

[3]        We will not adopt the social worker's use of the outdated term "retardation," although we recognize this terminology is still used by some medical professionals.  In recent years, there has been a shift in favor of using the term intellectual disability because retardation "has itself become pejorative" and to many the term "mental retardation is scientifically worthless and socially harmful." (Nash, *What's in a name? Attitudes surrounding the use of the term 'mental retardation'* (Feb. 17, 2012) Pediatrics Child Health, <https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3299349/> [as of July 15, 2020].)

children's location in the large visitation room, and her history of crying in front of them. SSA gave Father one hour of unsupervised visits. On one occasion Father rewarded A.B. when Mother was trying to discipline the child with a time out.

The social worker reported A.B. was participating in counseling and his therapist noted he was making mild progress. Then three-year-old A.B. would get overexcited when it was noisy, and he was not potty-trained. He did not like to flush the toilet. He would crash into others at the group home, whine to get attention, and displayed aggression towards animals. In contrast, the social worker stated there were no concerns about I.B.

A few months later, in May 2018, the social worker reported Mother completed individual counseling and the therapist was not recommending additional sessions. The therapist explained Mother had not made progress because she was often argumentative and in denial about her issues. The social worker noted Mother and Father started joint counseling and they wanted to reunify for the children's benefit.

Mother was on a waitlist for a parent mentor from the Braille Institute and to complete a second in-home parenting program. Mother continued to visit the children at New Alternatives on Tuesdays and Thursdays. She fed the children and "engaged with them." In April 2018, SSA approved one hour unmonitored visitation for Mother in a separate smaller room at the New Alternatives Campus. The social worker stated that if Mother did well, she would increase the time and permit Mother to take the children to a different location. The social worker noted there were plans to have Mother visit the children at their group home, but the home rejected this plan due to staffing issues. To avoid losing track of her children or holding an unrelated child, Mother was instructed to use bells to locate her children. Mother also dressed them in dark clothing to help her locate them.

The social worker reported A.B.'s ability "to follow instructions and accept decisions" was improving with the help of his group home staff. He was communicating

better and responded well to immediate reinforcement. However, he struggled and required "one on one attention." He was unable to use calming down strategies due to his developmental delays. His behavior regressed when he was with Mother.

In May 2018, the social worker visited Mother at home. She observed the rooms were clean and "free of health and safety hazards." Mother was appropriate with the children during visits and requested additional unsupervised time. Mother reported she would benefit from a guide dog, but the process involved traveling to the Bay Area for three weeks, and she did not want to miss visits with the children.

In June 2018, the social worker learned the parents had been living together for a month, and Mother was pregnant. Because Father was living at the house, Mother was at risk of losing the housing. Mother's landlord reported Father yelled obscenities at Mother and was told to leave on a regular basis. On one occasion Father pulled Mother's hair and called her names. The police had once been called to investigate following a verbal argument. The therapist terminated the joint counseling sessions due to Father's lack of attendance. The therapist noted Father had unaddressed power and control issues. Mother later disclosed Father was telling her what to say during conjoint therapy. Mother completed her batter's treatment program, however, the provider wrote Mother's skill level was impaired and without continued support she may return to her past behaviors.

The court continued services and scheduled a review hearing for August 2018. It ordered that the parents maintain separate housing and participate in joint therapy "for parenting purposes." A new social worker was assigned to the case.

The couple did not comply and continued to live together. Mother received an eviction notice. Mother attended one of Father's unsupervised visits at the park to show the children her new service dog. In addition, the social worker caught Mother texting Father after she agreed to stop contacting him.

During her visits with the children, Mother continued to struggle with addressing A.B.'s tantrums and aggressive behavior. During one visit in June 2018, the social worker observed A.B. eating his own feces while I.B. was spreading feces on the floor "during a diaper change, while [Mother] was focused on talking about [Father]." During I.B.'s birthday party, A.B. pushed I.B., causing him to fall back and hit his head while they were sitting next to Mother.

In an addendum report, prepared in September 2018, Mother reported she believed A.B. was doing better because he was not hitting her as often and he made a friend at the visitation center and he did not hit his new friend. Mother claimed the visits were going well and the children enjoyed playing, watching television, and sharing meals with her. Mother noted she often baked and made lemonade with the children. However, there were two troubling instances during visitation when A.B. was naked due to a diaper change. On one occasion, he sat on I.B.'s face and a different time put his penis on I.B.'s face. The social worker also reported Father stated Mother served him with a restraining order, and they were no longer in a romantic relationship.

The juvenile court held the 18-month review hearing on September 25, 2018. It determined the parents had made minimal progress with their case plans and scheduled a section 366.26 hearing (permanency hearing) to select a permanent plan for the children. The court terminated reunification services. However, it also ordered SSA to keep open existing service referrals until the permanency hearing.

Ordinarily, the permanency hearing takes place and concludes within a few months after the court terminates reunification services. In this case, the hearing originally scheduled for January 16, 2019, was not completed until the following year, January 28, 2020. The delay was caused in part due to SSA's inability to locate prospective adoptive parents for the boys due to A.B.'s behavioral issues.

We take a moment to briefly summarize the instability the boys have experienced for the past three years in four different placements, because it is relevant to

10

our later analysis of the court's ruling. The boys stayed in their first group home (Boys Town) for only six months and SSA was having difficulty finding a foster home. In August 2017, the boys temporarily lived in a foster home, but were removed after only one month due to A.B.'s behavioral issues. Next, the boys were placed in a group home where they remained until February 13, 2019. In those 16 months, SSA could not find a suitable placement due to A.B.'s behavioral problems. Starting in July 2018, SSA began to regularly submit 15-day review reports about failed efforts to find a foster home. Before the 18-month review hearing held in September 2018, SSA had filed seven 15-day review reports stating SSA was unable to find a suitable placement. In the months leading to the permanency hearing, scheduled in January 2019, SSA filed seven more 15-day review reports about the inability to find a suitable placement because of A.B.'s behavioral problems. In the January 2019, 15-day review report (the 14th report filed), SSA noted the group home's "house parents" agreed to taking the children under an "emergency placement." In the social worker's next report prepared for the permanency hearing, he requested a 30-day continuance to place the boys with prospective adoptive parents. The court continued the case and the boys remained in the group home because the foster parents previously lived out of state which led to a delay in approving the adoptive placement. SSA requested a hearing in its next 15-day review but on January 16, 2019, the social worker reported a suitable home was not yet available. The court ordered an emergency placement into the care of the foster parents. In February 2019, the children were placed with the foster parents. Because the boys had worked with the house parents for two years, the boys adjusted to the placement quickly. When the court made its ruling on Mother's section 388 motion the following January 2020, the children had been living with the foster family for approximately 11 months.

During the year of services provided before the permanency hearing, the social worker filed multiple reports about the status of the family. As for A.B., his behavioral problems only minimally improved. In November 2018, the social worker

11

reported A.B. was potty trained at school and home, but not for Mother during her visits. Several times he had been sent home from school due to "incidents of aggression." A.B. continued to be aggressive towards his brother. The therapist noted A.B. regressed regarding his ability to follow instructions and accepting boundaries. Mother stated A.B. may be jealous of his younger brother who needs more attention. The social worker noted I.B. had been aggressive towards staff but took "re-direction well."

Mother's therapist, Jane Canseco reported Mother attended sessions regularly, she was highly motivated to reunify, and she was resolved to keep away from Father. Mother had "rekindled healthy relationships with old friends from high school and they [had become] a support system for her." Canseco stated Mother developed more self-esteem and self-hope for herself. However, Father's therapy was terminated because he was uncooperative and combative.

The parents continued regular visits with the children but struggled with A.B.'s behavioral issues. Mother never missed a visit and saw the children for six hours on Tuesdays and five hours on Thursdays. The social worker reported Mother always arrived to visits on time and with food for the children. She interacted with them by playing and doing activities. Frequently, A.B.'s physically aggressive behavior made it difficult for Mother to interact. She attempted to disciple A.B., by putting him in time-outs, but these appropriate techniques often made the tantrums worse. She allowed herself to be slapped in the face and pushed. Staff noticed Mother did not always use her eyeglasses or put bells on the children to ensure their safety.

In February 2019, Father filed a section 388 petition requesting the children be returned to his custody or that the court order further reunification services. Father maintained he completed an anger management class and started individual therapy. In March 2019, Mother also filed a modification petition requesting return of the children with family maintenance services. She maintained that through weekly therapy sessions she had gained insight into her toxic relationship with Father. She understood he was

12

controlling, manipulative, jealous, and angry any time she interacted with men. She learned the relationship created an unhealthy environment for herself and her children. She was not in a relationship with anyone and her therapist taught her how to cope with Father's negative behaviors. Mother added she had benefited greatly from additional classes at the Braille Institute after the court terminated reunification services. She learned how to read Braille, which allowed her to become more independent. She could now read articles and books about parenting. Mother also enrolled in cooking classes to learn how to prepare nutritious meals for her children in a safe way. Additionally, Mother enrolled in a class on "Safety Inside my Home," which taught her how to take care of her children as a single parent. She believed these classes allowed her to be more independent and a better parent. Mother was working, rented a room, and received disability benefits.

In her petition, Mother described visits with the children, where she is responsible for all their needs for a lengthy period of time (six hours on Tuesday and five hours on Thursday). Finally, Mother explained it would be in the children's best interests to live with her because she was no longer in a domestic violence relationship and they were "extremely bonded." The court determined there was prima facie evidence for a hearing on both petitions and scheduled them to take place the same day as the permanency hearing.

In an addendum report prepared at the end of March 2019, the social worker noted A.B. was physically aggressive towards I.B. and there was a growing concern about I.B.'s safety. The following month, the foster parents reported I.B. had started to retaliate against his brother and was also instigating physical aggression. The foster mother reported A.B. was more aggressive at school and during visits with his parents. The social worker noted Mother continued with counseling and the therapist noted she was doing well.

When the funding for therapy ceased, the therapist's request for an extension was denied. The social worker reported A.B. continued to be aggressive towards his younger brother, especially when I.B. received attention. In school, A.B. started to become aggressive with the other children. His teacher reported that whenever she asked A.B. to do work he would act out by walking around the classroom and screaming he does not want to do the work. In June and August 2019, the social worker reported Mother was not using her special eyeglasses and not consistently using bells on the children.

In September 2019, A.B. was suspended from school for two days due to aggressive behavior towards his classmates and the teacher. The school developed a "section 504 plan"[4] for A.B. which shortened his school schedule (8:00 a.m. to 11:00 a.m.) and provided him with the assistance of a special one-on-one aide.

The court took 14 days to consider evidence and argument related to the parents' modification requests, and due to continuances, the hearing lasted from April 2019 to January 2020. The court considered testimony from Mother, her therapist, Mother's mentor, Mother's youth support specialist, the foster mother, and the social worker.

Amy Carrillo, a youth support specialist at the Orangewood Foundation, stated Mother was one of her clients. She would help Mother obtain needed services, housing, and transportation. She saw Mother approximately three times a month but had not observed her with the children. She stated Mother was employed and applied for transitional living services.

Michelle Koontz, a volunteer mentor at Orangewood Foundation, stated she had mentored Mother for three years. She visited with Mother two to four times per

---

[4] Section 504 of the Rehabilitation Act of 1973 and the federal implementing regulations require public schools to provide a plan of accommodation for children with qualifying disabilities to satisfy their special needs.

month for a few hours.  She helped Mother fill out job applications, explore housing options, and provided her with transportation.  She and Carrillo would discuss Mother's progress.  Koontz observed Mother with the boys for approximately 10 months before they were taken into protective custody.  During her visits with Mother, the children would often join them on outings.  She did not have any safety concerns and stated Mother took care of her children's needs.  When asked to elaborate, Koontz said she saw Mother feed the children, change their diapers, and play with them.  She never saw Mother harm the children although she noticed sometimes Mother looked frustrated.

In addition, Koontz joined Mother on approximately 10 supervised visits.  She was never concerned for the children's safety.  She opined A.B.'s behavior had become worse after he was removed from Mother's care.  She explained he would throw temper tantrums anytime he was told to do something.  She saw staff members intervene when A.B. would not listen to Mother.  She also observed Mother losing track of the children.  She did not see the children being aggressive towards each other.  Koontz concluded now that Mother was 21 years old, she had matured and was more responsive to help and guidance from others.

Mother testified she had been legally blind since the fourth grade and glasses did not help her vision but rather created stress and pain.  She claimed her doctor told her to stop wearing the glasses because they were damaging her eyes by drying them.  Mother stated she could take care of her children and meet their needs.  She was the primary caregiver before they were detained because Father worked and would not come home until late at night.  She stated that when she was living at a group home, A.B. was a baby, and staff from the Braille Institute taught her how to clean, feed, bathe, and cook for her baby and other parenting skills.

Mother understood the children were removed from her care because they were being exposed to a harmful cycle of domestic violence.  After attending anger management programs and a batterer's treatment program, Mother claimed she had

learned the "'red flags'" and her relationship with Father was not healthy. She realized he was controlling, minimized problems, and always placed the blame on her. She added Father even tried to control the information Mother gave to her therapist, telling her to lie. Mother described how Father taught A.B. it was okay for him to treat Mother badly like Father treated her. She knew Father was not a good influence in her life and she had ended her relationship with him approximately eight months prior. She had not communicated with him for three months.

Mother obtained a temporary restraining order but could not attend the hearing to make it a permanent order because she was dealing with extreme eye pain requiring hospitalization. Mother reported Father had shown up twice at her visits and he was texting her until she blocked his messages.

Mother testified she attended individual counseling once a week, working on how to truthfully and better communicate with others, and better understand how domestic violence impacted the children. Mother wanted to continue therapy. Mother also discussed the reason why monitored visits with the children were difficult, especially when they were not wearing bells. The visitation room was large and was occupied by approximately 10 families, each having multiple children. During unsupervised visits, she was in a separate room and this less crowded arrangement also made A.B. less anxious and aggressive. Mother stated visits in the smaller room were preferable because the children listened to her and would not fight. She believed A.B. would become anxious when they were in a crowd and would ask to go outside, but this was not possible due to lack of staffing to supervise. Mother recalled one visit with only I.B. because A.B. was on a vacation. Mother reported the visit went well, there was no reason for timeouts, and I.B. "loves Mommy . . . [and h]e likes the attention."

Mother discussed A.B.'s behavioral challenges, noting he hit and bit teachers and children at school. Sometimes he had to be picked up early from visits because he was out of control. Mother claimed that before she did not know how to

16

control A.B. but now with help she does better.  She believed it would be easier to care for the children in her apartment, because the children did not understand what was going on at visits but at home, they would know they were with Mother and have more freedom.  Mother understood she would need to use bells consistently and use a safety gate to keep the children out of the kitchen when she was cooking.  Mother stated she planned to use resources at the Braille Institute as well as help offered by her mentor and her roommate, who offered to babysit.  Mother was determined to keep her children away from negative people and influences.  She learned how to child proof her home and the Orangewood Foundation would help her address any safety issues.  She had considered getting a harness when she had unsupervised visits, because she planned to take them on outings, and the harness would keep them from running away.

Social worker, Michael Cos, testified he had been assigned to the case since August 2018.  Cos discussed how I.B. did not have the same behavioral concerns as A.B.  For the next school year, A.B. would have an Individualized Educational Plan "IEP behavioral assessment," provided to children with disabilities.  A.B.'s behaviors had recently started to escalate at school and during visitations.  A.B.'s behaviors were more controlled at home with the foster parents, but he was defiant and aggressive towards his younger brother, often causing scratches and bruises.  Cos noted the foster parents were trying to qualify for Therapeutic Behavior Services (TBS) designed for children with serious emotional challenges.  I.B. had started to retaliate against his brother.  Cos stated the foster parents followed through with disciplining A.B. and were committed to adopting both children.  At the time of the hearing, A.B. had again been suspended from school, and the social worker apologized this information was not in his last report.  A.B. was suspended for hitting an aide in the face.

Cos recognized Mother's visits at a center with other families (noise and many distractions) was not the ideal setting for Mother or A.B.  During visits at the park, A.B. was not aggressive and there were no reports of misconduct by the children.  Cos

17

was concerned about Mother's ability to protect the children because she was not using her eyeglasses or the bells on a regular basis. She also had trouble disciplining A.B. during visits. He admitted Mother understood her children's basic needs and what was required of her. Cos opined Mother could not keep her children safe if they were returned to her care, explaining if they are crossing the street the children could run off. He clarified this concern was not because Mother was blind. He also admitted A.B. ran away in settings apart from being with Mother.

In addition, Cos opined it was not safe to return the children because Father was still bothering the family. Mother had not filed a permanent restraining order against him. Specifically, Father twice went to the visitation center with food for the children during Mother's visitation time, and she rejected the food. He recalled Mother also reported there was an incident Father showed up at her home when she had friends over, and he allegedly broke a friend's truck's window.

Canseco testified she saw the couple for joint therapy from May through September 2018, and then Mother attended therapy by herself until May 2019. Canseco stated she supported Mother's assertion her circumstances had changed. In her sessions with Mother, they discussed parenting, and, in particular, Mother's role as being a single parent. They also discussed how domestic violence was impacting Mother and the children, and Mother was focused on creating a safe environment for the children. She acknowledged and took responsibility for her past decisions. Mother discussed how situations could have been handled differently. A lot of therapy was spent building self-esteem, a trait necessary to make healthy decisions.

Canseco testified she and Mother also discussed A.B.'s difficult behavior and Mother did not want to give up on him. Mother was working on how to move forward and determine what should be done to avoid A.B.'s triggers. She was working on redirecting A.B. and had the goal of decreasing the impact of domestic violence. Mother was resolved to stay away from Father and determined to do everything possible

18

to protect herself. She had cut off negative relationships with some other friends as well as Father. The therapist noted Mother attempted to get a restraining order in the past, but due to an issue with her eyes, missed the court hearing. The therapist stated this fact did not affect her opinion about Mother's resolve and understanding of the need to protect herself. Canseco believed Mother improved her self-esteem and strengthened her belief in her own abilities, and Mother's positive changes would continue. She concluded Mother had achieved many treatment goals, such as separating herself from a toxic relationship, no longer being in denial about her challenges, developing newfound self-esteem, and understanding safety requirements and her children's needs. She would be willing to provide additional therapy if the children were returned to Mother.

The foster mother testified she provided day-to-day care for the children since February 2017, because she worked in the children's group home as a house parent. The foster mother stated she disciplined the children by using time-outs, taking away privileges, and calming them down. She admitted A.B. could be very difficult to handle and would sometimes hit I.B. with a toy for no reason. Although the frequency of these events had improved, the foster mother had hoped for better. She recalled one occasion when A.B. put his younger brother in a headlock, causing red marks on the child's neck. Despite seeing a therapist, A.B. had to switch schools because no one could manage his aggressive behaviors in class at his first preschool. He would be disruptive, throw toys, and refuse to listen. At his new preschool, A.B. was suspended for dumping out his school items, turning over a table, and attempting to throw a chair at the teacher. His behavior issues would "spike" when the teachers would start the curriculum for the day. His outbursts at school would happen once or twice a week.

The foster mother was preparing A.B. for kindergarten, and she hired a tutor. She spoke with the school psychologist and noted A.B. would be assessed for an IEP. She opined he was less aggressive than in the beginning of his placement, and she noticed he was now more likely to seek help from an adult rather than act out. However,

19

he would become anxious and act out if his routine changed. He would express anger when he felt Mother ignored him, and he once cried because he wanted to stay with Mother at the visitation center.

The foster mother described I.B. as being genuinely nice, and he liked to share. He was attending preschool and loved going to class and was doing well. The foster mother noted I.B. acted the same before and after visits. She believed the boys were bonded to each other.

After all the evidence was presented, minors counsel argued nothing had changed because A.B.'s behavior was still out of control and getting worse. Counsel noted A.B.'s aggression towards his younger brother also had not improved, and it was clear I.B. was "almost a punching bag at these visits." I.B. sat close to his Mother because he was "terrified of his older brother" who repeatedly hit I.B.'s head and stomach. Counsel stated, "I understand that Mother loves the children and she wants to have them enjoy visits with her, but she, in her inability to intervene, places I.B. at risk . . . ." SSA joined in minors' counsel's arguments. The parties also presented arguments regarding the permanency hearing. The court continued the matter and asked the attorneys to address two issues relating to evaluating the children's best interests in a situation where only one child was returned to a parent.

At the next hearing, Mother's counsel argued the children were not similarly situated. She read from visitation logs demonstrating A.B.'s relentless abusive actions towards I.B. and Mother. Every visit described bites, kicks, punches, curses, and violent pushes. She also read visitation logs describing these same behavioral issues occurring during visits with Father. Counsel stated the foster mother also testified about the abuse. She recounted the following two incidents: (1) in October 2018, the foster mother recalled she heard muffled screams and found A.B. had pinned I.B. down and choking him; and (2) A.B. was suspended from school after he stabbed another student with a pencil, flipped over a chair which hit a teacher, and kicked a teacher. Counsel

20

noted A.B. was "a 504 child at school" and required one-on-one supervision by an aide trained in handling special needs kids, yet he was not being controlled at school. Mother's counsel concluded A.B.'s extremely aggressive behavior put I.B. at great risk of being injured. She added that in answer to the court's question about the best interests analysis, she was unable to find any case law placing restrictions on the court separating the children. She maintained it was not in the children's best interests to keep them together.

Mother then changed her modification request, asking the court return only I.B. to her custody. She stated all the visitation logs demonstrated a change of circumstances because, aside from A.B.'s dangerous behavior, there was nothing mentioned about Mother's inability to care for I.B. "It has always been [A.B.] And that has always been the huge shadow that has been cast on this case, about the fact that [Mother] has so much difficulty, and Father, during the visits in reference to [A.B.] [¶] So it's completely . . . ignored, about the fact of how is Mother parenting [I.B.]. And there's no evidence that she can't parent I.B. Clearly, there's a lot of evidence--I don't know of anyone, arguably, can parent [A.B.], but I'm not asking for [A.B.] to be placed with [Mother]." Father's counsel joined with Mother's argument that there was ample evidence the children were "separately situated with their behavior issues and their well being." Father's counsel asserted Mother met her burden as to her section 388 modification petition.

The children's attorney argued it was not in the children's best interests to be separated. He conceded the reports mostly discuss A.B.'s behavior as he "kind of sucks the energy out of the room." He noted the reports also show Mother forgot her bells to keep track of the children and she was not wearing her glasses. He recalled a report stating Mother once struggled to calm I.B. down and "scold[ed] him, while looking at her phone." Counsel argued the domestic violence in the case "was extensive" and took place in front of the children. He added A.B. swallowed iodine while in Mother's

21

care before this case was filed. There was a history of an untidy home and Mother struggled with the children's behavior. He concluded the boys were placed in a home able to control the behaviors "better than anyone else had been able to control them" and they both have the best chance of "having a successful life" if adopted by the foster parents. He added, I.B. should not be returned to Mother simply because the boys are difficult together. Counsel added it was not in I.B.'s best interests to be returned to Mother who has never had a full day with him unmonitored. During visits, she needed the monitors' assistance and was at best viewed as a friendly visitor.

SSA requested the court deny Mother's 388 petition because she could not provide I.B. appropriate care and it would not be in his best interests. Counsel urged the court to consider the sibling bond and a child's need for permanency and stability when ruling on section 388 petition.

The court denied Father's section 388 petition but granted Mother's petition, concluding Mother had demonstrated a change in circumstances and it was in I.B.'s best interests to return to her care. The court reviewed the case's history and commented that due to all the continuances, the parents ultimately had an additional year to prove they were ready for the return of their children. Based on its analysis of the case law discussing section 388, the court concluded Father failed to demonstrate changed circumstances. In contrast, the court determined "Mother's efforts in this case are genuine, appear to be permanent, and [Mother] is prepared to take on the role of a parent." The court concluded that in addition to completing her case plan, Mother continued her efforts after services were terminated. She asked for additional funds to continue counseling. The court found significant Mother could articulate what she learned in therapy regarding surviving domestic violence and developing parenting skills needed for a single mother with mental and physical disabilities. The court noted Mother's testimony was "bolstered" by Canseco's testimony.

22

Moreover, the court found relevant Mother had significantly distanced herself from Father, recognizing he was a negative influence. It stated, "The [c]ourt does not attribute any blame to [Mother] for Father's appearance at her visitation hours, noting that [she] refused even his offer to provide food for the kids. Furthermore, there's no evidence [Mother] invited Father to the visits, or otherwise encouraged his presence." The court stated it also considered Mother's failure to pursue a permanent restraining order against Father in 2018 and 2019. It reasoned, "from all appearances, Father has since left her alone, notwithstanding his appearances at her visits, which she's rejected." The court believed Mother was aware of how to protect her kids and if Father were to harass her in the future Mother would either call the police or obtain a temporary restraining order.

The court also appreciated Mother's efforts "to improve herself through the Braille Institute, and [she] can articulate how she can be protective if the court returns" one or both boys. On the subject of Mother's use of bells and glasses, the court found "no issues" because the glasses were not beneficial, and the bells did not have to be placed on the children's shoes to be audible. The court noted Mother consistently visited the children for long periods of time twice a week, and despite difficulties with A.B., she was sincere in her commitment to the children.

On the best interests prong, the court first looked at the factors discussed in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*).) After discussing the case, the court stated the list of factors in the case were "not exhaustive" but were helpful in considering a section 388 petition. The court was confident the problems that led to detention would not reoccur. It concluded Mother was in a position to properly parent I.B. and keep him safe. Additionally, the court determined I.B. was bonded to Mother and the foster parents. It acknowledged Mother's visits were supervised but noted visits also lasted a substantial length of time each week. The court determined Mother made every attempt possible to stay connected to her children.

23

The court recognized the foster parents also had a "strong relationship" with the children because they were involved as house parents in the boy's group home for a long time. In examining I.B.'s best interests, the court stated the following: "[I.B.] may be bonded to [A.B.], but at what expense? The court believes that [I.B.'s] continued exposure to [A.B.] puts him at significant risk of harm, which has already occurred both at visitation and at the caregiver's own home, and that harm is at the hands of [A.B.] The court finds that there's a significant risk of [I.B.] having continued exposure to [A.B.], mimicking the behaviors of his older brother." In addition, the court stated it was relying on many witnesses who agreed I.B. was a trigger for A.B.'s acting out. The court concluded that while there may be some emotional difficulty separating the boys, "I.B. should not be subjected to continued physical abuse at the hands of his brother, while [A.B.] hopefully works out his issues. [¶] Furthermore, [I.B.] should be permitted to have the opportunity to be a child, and allow his own behaviors to grow positive."

The court ordered family reunification services for Mother and therapy services for her and I.B. to address any separation issues and new behavioral issues mimicking his brother. The court was unsure what to do about A.B.'s permanency hearing because it was unclear if the foster parents were willing to adopt just one child. In addition, the court wanted to resolve the issue of whether there was a parental bond or sibling bond exception to terminating parental rights. It continued the permanency hearing.

SSA's counsel asked the court to clarify which standard it was using to grant the section 388 petition. It replied it used the *Kimberly F.* framework. It also stated, "The court finds that continued supervision is necessary, and I find pursuant to section 366.21, [subdivision (f)] that by a preponderance of the evidence standard, return of the child to the mother would not create a substantial risk of detriment to the safety, protection or physical or emotional well being of the child and the child's placement in

24

foster care is no longer necessary and appropriate." The court granted the minors' counsel's request for a seven day stay to file a writ petition.

Mother's counsel pointed out the court did not need to make a finding under section 366.21 subdivision (f), if it already followed the two-prong analysis required under section 388. The court indicated it understood the different standards and the reason it referred to section 366.21 was because it wanted to make sure the case was not closed after I.B. was returned to Mother's care. "I do believe that services are still necessary in this situation. I think it appropriate for social services to still supervise [Mother]." The court stated it used the appropriate section 388 two-prong standard in concluding the child should be returned to Mother.

I.B.'s counsel filed a petition for a writ of supersedeas. This court denied the writ petition in March 2020.

DISCUSSION

Under section 388, subdivision (a)(1), the parent of "a dependent child of the juvenile court" may, "upon grounds of change of circumstance or new evidence," petition the juvenile court "for a hearing to change, modify, or set aside any order of court previously made . . . ." The juvenile court must hold the hearing "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . ." (§ 388, subd. (d).) "Generally, the petitioner must show by a preponderance of the evidence that the child's welfare requires the modification sought. [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228 (*B.D.*).) "To support a section 388 petition, the change in circumstances must be substantial. [Citation.]" (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

We review the juvenile court's decision to grant or deny a section 388 petition for abuse of discretion. (*In re Y.M.* (2012) 207 Cal.App.4th 892, 920.) "[T]he trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.] As one court has stated, when a court has made a

25

custody determination in a dependency proceeding, "'a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'" [Citations.] And we have recently warned: 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*).)

The nature and role of section 388 was best described by our Supreme Court in *In re Marilyn H.* (1993) 5 Cal.4th 295 (*Marilyn H.*). "Essentially, *Marilyn H.* teaches us that section 388 *really* is an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights. [Citation.] As such, section 388 is vital to the *constitutionality* of our dependency scheme as a whole, and the termination statute, section 366.26, in particular. [Citation.] [¶] *Marilyn H.* . . . arose out of poor living conditions. . . . The two children who were the subjects of the case lived in a [14]-foot trailer with broken windows and holes in the open desert with no electricity or running water. [Citation.] The case progressed through an 18-month hearing where reunification services were terminated because the parents had only shown 'moderate compliance' with the reunification plan. Then—as so often happens in dependency cases—the parents *began* to get their act together in the 120 days between the 18-month review and the permanency planning hearing: They completed programs which were part of the reunification plan regarding a third child born during the pendency of the proceedings concerning the first two children." (*In re Kimberly F., supra*, 56 Cal.App.4th at p. 528.)

In the *Marilyn H.* case, the court refused to return the minors to their mother at the permanency hearing and the appellate court affirmed the decision. (*Marilyn H., supra,* 5 Cal.4th at p. 298.) The Supreme Court agreed, holding the

26

placement options set forth in section 366.26 were exclusive and did not violate the parent's due process rights when read in conjunction with section 388. (*Marilyn H., supra,* at p. 300.) The high court explained, "Section 388 provides the 'escape mechanism' that mother maintains must be built into the process to allow the court to consider new information." (*Id.* at p. 309.) "*Even after the focus has shifted from reunification*, the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of his custody status." (*Ibid.,* emphasis added.) The Supreme Court added, "the Legislature has provided the procedure pursuant to section 388 to accommodate the possibility that circumstances may change after the reunification period that may justify a change in a prior reunification order." (*Ibid.*)

A. *Change of Circumstances Prong*

In the case before us, SSA removed the children due to their exposure to domestic violence and a messy home. As well documented in the record, this case languished for several years because the sibling set was difficult to place in a foster home due to A.B.'s extreme behavioral issues. Moreover, Mother struggled to escape her abusive relationship and develop the confidence and self-esteem to carry on as a single parent.

Unlike most dependency cases we encounter, Mother had much longer than 120 days "to get [her] act together" (*In re Kimberly F., supra*, 56 Cal.App.4th at p. 528), between the 18-month review and the permanency planning hearing. Mother took advantage of an additional year of services. For reasons explained in more detail below, we conclude she presented substantial evidence that supports the trial court's finding of changed circumstances.

With respect to the dependency petition's allegation of unsanitary living conditions, this concern was remedied early in the case. Most of the reports do not mention this issue. When the social worker visited Mother in May 2018, she reported the

27

rooms in Mother's home were clean and "free of health and safety hazards." Mother testified that *after* services were terminated, she enrolled in additional classes at the Braille Institute to continue learning about ways to make her home safe for young children. She discussed what additional measures she would take to baby proof each room if the children were returned to her care. It was reasonable for the court to determine this circumstance had changed.

The most serious allegation in the petition was the children's exposure to domestic violence. Mother presented evidence that in addition to completing all aspects of her case plan, she was highly motivated to achieve several personal goals with therapy. SSA and I.B.'s counsel both argue the fact that Mother completed her reunification case plan cannot be evidence of changed circumstances. While this is true, completing her reunification case plan was relevant evidence regarding Mother's forward progress over the past two years in separating herself from Father. The enormous difficulty in separating from a controlling and dominating abuser, particularly for someone with learning and physical disabilities, cannot be overstated. (See Stoever, *Transforming Domestic Violence Representation* (2013) 101 Ky. L.J. 483 (*Transforming Domestic Violence*).)

As part of her case plan, Mother completed two parenting programs, a PEP, a domestic violence program, a psychological evaluation, individual therapy, a mentor program, and classes/services provided by the Braille Institute. Mother's progress over the past year must be viewed in the context of what she had already achieved, because the path to independence from an abusive relationship is neither linear nor the same for everyone. (See Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome* (1993) 21 Hofstra L.Rev. 1191, 1225 ["All women exposed to violence and abuse in their intimate relationships do not respond similarly, contradicting the mistaken assumption that there exists a singular 'battered woman profile.' Like other trauma victims, battered women differ in the type and

28

severity of their psychological reactions to violence and abuse, as well as in their strategies for responding to violence and abuse"].)

After the court terminated services, Mother voluntarily continued with therapy, where she strove to learn how to be a better parent and achieve lasting independence from Father. There was evidence to support Mother's claim she had changed her outlook on relationships with toxic people, dropping unbeneficial friendships while at the same time actively developing a caring network of new friends and appreciating the positive influences offered by her mentor. Mother testified she now could identify the "red flags" and the harm created by domestic violence. Canseco's testimony supported Mother's claim that she was determined to keep her distance from Father and maintain permanent separation from his abusive cycle. Canseco confirmed Mother's improved self-esteem was necessary to make these healthy decisions. It was also undisputed Mother enrolled in additional classes at the Braille Institute, where in addition to learning more life skills, she came to realize her blindness need not stop her from raising a happy and healthy child as a single parent. Based on all the above, we cannot say the court abused its discretion in concluding Mother demonstrated changed circumstances with respect to domestic violence.

I.B. and SSA maintain the court should have denied Mother's section 388 petition because there was no "true" change of circumstances based on her "history." Both attorneys repeatedly refer to Mother's "pervasive and long standing" denial about her situation and her past failures to separate herself from Father as conclusive proof the abusive relationship will persist. SSA asserts there is no evidence Mother's "compulsive involvement with him ceased" particularly because she previously lacked a support system and failed to follow through by obtaining permanent restraining orders. SSA quips Mother's temporary restraining orders "were largely cosmetic" and demonstrated no changed circumstances. I.B.'s counsel echoes these allegations and added Mother's testimony lacked credibility because her "conjoint therapy was based on a web of lies."

29

Both attorneys argue, without any supporting legal or scientific authority, that eight months of separation was insufficient evidence of changed circumstances.

We reject these arguments because they fail to consider our standard of review and improperly rely *only* on evidence unfavorable to Mother. To the extent the juvenile court credited Mother's testimony and other witnesses, we do not upset those credibility determinations on appeal. Moreover, these arguments reflect a shocking lack of understanding about survivors of domestic violence. Terms such as "compulsive involvement" perpetuate the myth of the helpless and weak battered women. (Kohn, *Barriers to Reliable Credibility Assessments: Domestic Violence Victim-Witnesses* (2003) 11 Am. U. J. Gender Soc. Pol'y & L. 733, 734 [describing society's preconceptions damaging the "credibility of victim-witnesses who present on the stand in atypical and non-paradigmatic fashions"].)

It should go without saying that not all abusive relationships end the same way. Yet I.B. and SSA suggest there should be solid evidence of something other than eight months of separation. Noticeably missing from the briefing is any discussion of what length of time would have been enough. When evaluating the complexity of domestic violence relationships, not every case will be the same. Unlike drug and alcohol addiction, there are no Alcoholics Anonymous (AA) meeting cards, coins, or clean tests to measure success. We conclude the court properly relied on other measures to evaluate Mother's assertion she permanently ended her toxic relationship with Father.

While courts are very familiar with experts testifying in criminal cases about the "Power and Control Wheel," and the "Cycle of Violence," these theories focus on the abuser partner's wrongful acts and the effect on the victim, not about the victim's needs and efforts to end violence. (*Transforming Domestic Violence, supra,* 101 Ky. L.J. at p. 486.) As highlighted in one treatise, there are five distinct stages domestic violence survivors follow when seeking an end to the relationship. (*Id.* at p. 518.) The path is not linear but cyclical. (*Ibid.*) "Studies have found that many abuse survivors attempt to

30

leave a violent relationship *five to seven times* before they are able to fully do so. Domestic violence survivors, like all people, want their relationships to be successful and want 'both to be safe, free, and unafraid, and to live with the partner they love or the partner they feel is needed to provide financial security for themselves and their children.'" (*Id.* at p. 523, italics added.)

"[L]eaving an abusive relationship or ending violence is a complex process." (*Transforming Domestic Violence, supra,* 101 Ky. L.J. at p. 525.) "Batterers' tactics 'are more than physical violence and induce a penumbra of threats and actions to induce fear, humiliation, social isolation, and resource deprivation.' . . . All of these tactics have one purpose: controlling the victim." (24 UCLA Women's L.J. 41, fn. omitted.) Thus, signs of real progress are difficult to quantitively measure and may require expert assistance, such as the testimony of a therapist or abuse counselor.

The case before us began with a single incident of violence, where Mother lashed out at her abuser by throwing something at him. As the case progressed, the true story about the unequal balance of power between the couple was revealed. There was evidence Father used jealous rages to isolate her, physical abuse to anger her, verbal abuse to harm her self-esteem and independence, and taunts to knowingly trigger a physical reaction. There was also evidence suggesting Father exerted financial control over Mother's disability payments. Untangling herself from this high level of manipulation and control was an enormous task. The court reasonably concluded Mother's ability to maintain separation from Father for eight months was only possible because his controlling tactics were no longer effective.

The court correctly saw other evidence indicating Mother understood what was necessary to permanently leave Father. Mother's therapist also gave several reasons for Mother's change of outlook. Specifically, through counseling Mother had gained self-esteem and confidence. By developing new friendships, finding a babysitter, and relying on positive relationships she was less isolated. Classes at the Braille Institute

31

taught her to stop feeling shame as well as provided an excellent support system for her journey as a single parent with a physical disability. She testified the new classes, which included learning how to read and write Braille, gave her new access to written resources. The classes helped Mother become independent. She regained financial control of her income and arranged for her own housing, demonstrating she no longer needed to be dependent on Father for life's necessities. These kinds of achievements were important benchmarks of success for a survivor of domestic violence, in addition to counting the months/years of separation. "Knowing how domestic violence operates is important in understanding how women might succeed in decreasing it. Because domestic violence is the operation of power and control over the woman, it makes sense that the woman's ability to exercise agency and autonomy within the abusive situation is related to her ability to address the abuse." (Johnson, *Redefining Harm, Reimagining Remedies, and Reclaiming Domestic Violence Law* (2009) 42 U.C. Davis L.Rev. 1107, 1126.)

I.B.'s counsel and SSA also improperly measured Mother's lack of success by her failure to pursue certain legal remedies. Like the trial court, we are not troubled by this evidence. As noted by the court, Mother did not invite or encourage Father to attend her visitation time. She rejected his offer of food, and there was no evidence he continued to harass her thereafter. Mother's therapist stated the omission did not change her opinion about Mother's ability to protect and care for her children. The trial court found this testimony credible. We do not reweigh the credibility of these witnesses. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52, [trial court's role to assess credibility of various witnesses].) Moreover, taking legal action is not always a good measure of success because "the legal system frequently provides an incomplete remedy to the violence" due to the "limited types of relief available, the short duration of court orders, and the challenges of the courtroom atmosphere." (*Transforming Domestic Violence, supra,* 101 Ky. L.J. at p. 530.) SSA seemed certain Father's unexpected appearance at

32

visitation to bring pizza would be enough to justify a permanent restraining order. We are not so confident.

We are also untroubled by Mother's admission she lied during conjoint therapy because Father told her what to say in June 2018. Mother's conduct while under the control of an abusive spouse should not be held against her indefinitely. The record shows she discontinued conjoint therapy and with the benefit of individual therapy, she learned to accept and learn from her past mistakes. Moreover, we question the wisdom of conjoint therapy as a requirement of reunification for a disabled Mother struggling to separate herself from an abusive relationship.

Finally, we are not persuaded by I.B.'s counsel's assertion Mother did not show a change of circumstances regarding her parenting ability because she did not progress past monitored visitation. The record shows Mother was given a period of unsupervised visitation in a separate smaller room and there were no concerns with her parenting skills. The parties do not discuss why Mother's unsupervised visits stopped, why she was not permitted to visit the children separately, or why she could not be accommodated for supervised visits in a less noisy, crowded room due to her disability. What the parties discuss at length are the reports full of evidence Mother could not control or discipline A.B., and it is appears this was the primary reason she did not progress to unsupervised visits.

As noted by the trial court, there was also ample evidence in the record that the inability to control or discipline A.B. was not due to Mother's lack of parenting skills. A.B.'s caregivers and teachers also struggled with A.B.'s behavioral issues. He qualified for "504 services" at school and received one-on-one supervision in school with a specially trained aide. Despite the extra attention, he could not be controlled at school and terrorized students and the teachers. The caregivers could not stop him from bullying his younger brother.

33

On a topic related to visitation, I.B.'s counsel asserts the court erred because it ignored Mother's history of forgetting her glasses and to put bells on the children during visits. The court saw the evidence on this issue differently, concluding the glasses were not beneficial and Mother would successfully use the bells at home. We are mindful of our limited standard of review and will not reweigh the credibility of witnesses. "'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations.]" (*Stephanie M., supra,* 7 Cal.4th at pp. 318-319.)

In summary, the record reflects the juvenile court became very familiar with the parties in this case. Unlike a typical dependency case, the proceedings lasted three years, involved multiple SSA reports, fifteen 15-day review hearings, and two weeks of testimony leading up to the 388 petitions. After carefully considering the evidence, we conclude the court did not abuse its discretion in determining Mother's petition presented new evidence of a change in circumstances satisfying the first prong under section 388.

B. *Best Interests Prong*

"In any custody determination, a primary consideration in determining the child's best interest is the goal of assuring stability and continuity. [Citation.] 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' [Citations.]" (*Stephanie M., supra,* 7 Cal.4th at p. 317.) However, the potential disruption of a current placement "is not dispositive" and other relevant factors to be considered is the child's age, length of the placement, and other factors related to permanency and stability. (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1305-1306.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount . . . and in fact,

there is a rebuttable presumption that continued foster care is in the best interest of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child." (*Stephanie M., supra,* 7 Cal.4th at p. 317.)

Here, Mother rebutted the presumption that continued out-of-home placement was in I.B.'s best interests. The court reasonably relied on evidence I.B., who was only three years old, was bonded to both Mother and his foster parents. Mother was I.B.'s primary caregiver for the first seven months of his life, and thereafter, remained a constant and positive presence every week. She never missed or was late for a visit. The foster family saw I.B. daily while he lived at the group home, and he transitioned easily to becoming a member of their family for nearly one year. I.B.'s bond to both Mother and his foster parents was not disputed by the parties. In addition, there was evidence to support the conclusion both Mother and the foster family were ready and able to provide I.B. with a permanent safe and loving home. I.B.'s need for permanency and stability was significant because he had been in four placements over a three-year period.

If our analysis were to stop here, it would be difficult to say Mother rebutted the presumption that adoption by the foster family was not in his best interests. What tipped the scales, and was discussed at length at the hearing, was that both potential placements had disadvantages. On one hand, there was evidence of a high risk of future harm to I.B. by his older brother at his current placement. If A.B. was one of the foster parent's biological children or an unrelated foster child, there would be little discussion about the appropriateness of placing I.B. somewhere he was being treated as a "human punching bag," sustaining bruises, scratches, and red marks on his neck. I.B.'s counsel and SSA argue there was a need to preserve the sibling bond, but they do not suggest how this relationship benefitted I.B.'s best interests and, in particular, his need for a stable home environment. Without a bonding study or expert opinion, there is little to contradict the overwhelming evidence the abusive nature of the sibling relationship was

35

unhealthy. Living in an abusive environment can provide permanency but not necessarily a healthy and stable situation. As noted by the court, I.B. needs and deserves a stable environment and "the opportunity to be a child, and allow his own behaviors to grow positive."

I.B.'s counsel correctly discusses many provisions recognizing the importance of maintaining beneficial sibling relationships "to the psychological health of dependent children" separated from their parents. (*In re Hector A*. (2005) 125 Cal.App.4th 783, 794.) This case is different because I.B. was being separated from a sibling to be reunited with his mother. While there was evidence of a significant beneficial relationship between I.B. and Mother, the same could not be said about I.B.'s relationship with his brother. Rather, I.B. was terrified of his brother. "Not all sibling relationships are strong or healthy." (Schwartz, *Family Law Siblings Torn Apart No More* (2001) 32 McGeorge L.Rev. 704, 708.) "Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 [discussing significance of sibling relationship in context of statutory exception to termination of parental rights].)[5]

On the other hand, the court weighed the evidence showing Mother had not cared for I.B.'s daily needs since he was an infant. She did not progress past monitored visitation. And as SSA and I.B.'s counsel repeatedly pointed out, she could not control or successfully discipline A.B. Mother addressed each of these concerns. Mother testified, and Koontz confirmed, Mother was able to take care of the daily needs of her young family (an infant and a toddler) before they were detained. As mentioned, numerous visitation logs show Mother engaged in typical parenting activities with the

---

[5]     We need not address Mother's tangential arguments premised on the theory the minors' attorney should have been removed for representing two children who had conflicting interests. We took judicial notice of the court's order noting counsel declared a conflict of interest and no longer represents I.B., rendering these issues moot.

boys and there were no concerns about her ability to play, sing, feed, read, or show affection. She was loving and attentive, and protected I.B. as best she could from attacks by his aggressive brother.

I.B.'s counsel asserts the court's finding was an abuse of discretion because there was absolutely no evidence Mother could provide unsupervised extended care. This is untrue. She provided excellent care during a time of unsupervised visits that took place in a smaller room, away from the chaos of other families. She testified her apartment was baby proofed and was a safe place for I.B. to play. There was no evidence suggesting her home was unsafe, or that Mother was unable to care for her child as she had done in the past. The court could reasonably conclude from the social worker's reports, Mother's testimony, and her therapist's testimony that Mother could provide a permanent, loving, and stable home for I.B. As discussed above, Mother's failure to progress past monitored visitation was primarily due to issues controlling A.B.'s behavior and aggressive outbursts, not her ability to attend to I.B.'s needs.

I.B.'s counsel suggests A.B. likely learned his aggressive behavior by being exposed to domestic violence, Mother's aggressive actions, and lack of parenting skills. Counsel speculates, "[I.B.] will surely suffer the same fate in [M]other's care." This allegation is completely unfounded. There is no evidence showing Mother is entirely to blame for A.B.'s unstable emotional health. A.B.'s aggressive behaviors have continued and worsened despite therapy, one-on-one school aides, appropriate parenting, and the additional loving support of the foster family. A.B. has qualified for special accommodations at school, has a history of becoming agitated and triggered in noisy environments, refuses to follow instructions, and requires a strict routine to remain calm. I.B., who also remained in close contact with Mother his entire life, exhibited none of these extreme emotional and behavioral issues.

Mother addressed the initial concerns about her ability to provide a safe living environment free from domestic violence. At the 18-month review hearing, the

court recognized her progress and did not terminate services when it scheduled the permanency hearing. None of the parties objected to keeping Mother in I.B.'s life while helping her take steps forward towards her goal of regaining custody. We will not disturb the juvenile court's ruling unless the parties clearly establish the court abused its discretion. (*Casey D., supra,* 70 Cal.App.4th at p. 47; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 [reviewing court cannot interfere unless "'we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order'"].)

C. *The Correct Legal Standard*

We turn next to SSA's argument the court utilized the wrong legal standard in evaluating I.B.'s best interests, which meant its order was necessarily an abuse of discretion. Counsel cites to the court's statement it was applying section 366.21, subdivision (f), which should be used at the 12-month review hearing and places the burden of establishing detriment on SSA. We conclude the court's reference to this provision was a harmless misstatement, because the record clearly shows the court applied the appropriate two-prong test used for section 388 motions.

At the end of the hearing on Mother's motion, the court made a statement regarding section 366.21, subdivision (f): "The court finds that continued supervision is necessary, and I find pursuant to section 366.21, subdivision (f)[,] that by a preponderance of the evidence standard, return of the child to the mother would not create a substantial risk of detriment . . . and the child's placement in foster care is no longer necessary and appropriate." As noted by the parents in their briefing, the court appropriately recognized Mother had the burden of proof to show changed circumstances and modification was in I.B.'s best interests. At the beginning of the hearing, the court correctly stated the applicable law. Mother, not SSA, carried her burden of proof as required under section 388, presenting evidence by directly examining several witnesses. At the end of the hearing, Mother discussed the two-prong test and the court made

38

detailed findings regarding those two factors, referring to pertinent and relevant case authority. There was no indication the court applied section 366.21, subdivision (f), in determining any of its findings or orders regarding the section 388 petition.

SSA does not mention that Mother's counsel asked the court to clarify why it mentioned section 366.21 because she was concerned the matter would be appealed and it would be unclear what standard the court applied in ruling on the motion. She asked if the court was "relying just on the [section] 388 standard that's in the code when the court made its finding." The court replied, "[Y]es. The reason I was making findings is . . . I'm not just simply returning and closing the case on [Mother.]" It wanted to make sure services continued and SSA supervised Mother.

It appears that the court was grappling with making its ruling without the benefit of an applicable code section to justify additional services. It borrowed language from section 366.21 saying "continued supervision is necessary" after I.B. was placed in Mother's care. We are confident the court did not apply the standards set forth in section 366.21 when ruling on the modification petition, and therefore, any error was harmless.

SSA also faults the court for referring to factors outlined in the *Kimberly F.* case, noting this court has determined those factors do not apply because they do not take into account the factors set forth by the Supreme Court in the *Stephanie M.* case. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).) This argument oversimplifies our analysis in the *J.C.* case. In that case, the mother made no effort to establish how modification would advance her child's need for permanency and stability as required by the *Stephanie M.* decision. Instead, she focused on her own progress and the *Kimberly F.* factors, suggesting her reunification efforts should be given more weight in evaluating her child's best interests. We concluded the child's best interests would not be to delay a permanent home "in favor of rewarding Mother for her hard work and efforts to reunify." (*J.C., supra*, 226 Cal.App.4th at p. 527.) We declined to apply the *Kimberly F.* factors because the mother failed to address the more important concepts of permanency and stability. In

39

the case before us now, Mother's services continued, and she established she could immediately provide I.B. a permanent and stable home. Because Mother met her burden of proof required by the *Stephanie M.* case, the court did not abuse its discretion in also considering the *Kimberly F.* factors which involved looking retrospectively at the parent's past conduct and bond with the child. Those factors added to the holistic evaluation of I.B.'s best interests, which in this case was particularly challenging. The court's lengthy discussion on the record shows it earnestly undertook the difficult task of evaluating all relevant factors in deciding which placement would provide I.B. with a permanent and stable home. We conclude the court did not abuse its discretion in returning I.B. to Mother's care.

## DISPOSITION

We affirm the court's order granting Mother's section 388 petition for modification. We grant Mother's request for judicial notice of the juvenile court's order dated April 3, 2020.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


FYBEL, J.

40